**UNITED STATES of America, Plaintiff,**

**and**

**State of New Jersey, Department of Environmental Protection, Plaintiff-Intervenor,**

**v.**

**ROHM AND HAAS COMPANY, INC.; Owens-Illinois, Inc.; Marvin Jonas, Inc.; CBS Records, Inc.; Manor Health Care Corporation; Cenco, Inc.; and Almo, Inc., Defendants/Third-Party Plaintiffs,**

**v.**

**Nick LIPARI, John Cucinotta and Joseph Cucinotta, Third-Party Defendants.**

Civ. A. No. 85–4386.

United States District Court,
D. New Jersey.

Aug. 19, 1987.

James C. Woods, Sp. Asst. U.S. Atty., Newark, N.J., for plaintiff, U.S.

Ronald P. Heksch, Deputy Atty. Gen., Trenton, N.J., for plaintiff-intervenor, State of N.J., Dept. of Environmental Protection.

Dechert, Price & Rhoads by Bradford F. Whitman, Wendy Relation, Philadelphia, Pa., and Montano, Summers, Mullen, Manuel & Owens by G. Wesley Manuel, Jr., Westmont, N.J., for Rohm & Haas Co.

McCarter & English by Joseph E. Irenas, Frank E. Ferruggia, Newark, N.J., for Owens-Illinois.

Shanley & Fisher by Arthur R. Schmauder, Moorestown, N.J., and Goodwin, Proctor & Hoar by Paul F. Ware, Jr., Frank C. Huntington, IV, Boston, Mass., for CBS.

Wall, Makowski & James by Kevin Wall, Oaklyn, N.J., for Marvin Jonas.

Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor by Anthony Reitano, Richard Ricci, Roseland, N.J., for Manor Health Care Corp.

## OPINION

GERRY, District Judge:

*Factual Background*

Plaintiff, the United States of America, on behalf of the Administrator of the United States Environmental Protection Agency ("EPA") has brought this action pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a), to recover costs it incurred for enforcement, investigation and clean-up activities at the Lipari Landfill in the Township of Mantua in Gloucester County, New Jersey. Plaintiff also seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, fixing liability upon the defendants for future costs incurred in the clean-up at the site. Named as defendants are Rohm and Haas Company, Inc. ("Rohm

and Haas"), Owens-Illinois, Inc. ("Owens-Illinois"), CBS Records, Inc. ("CBS"), Manor Health Care Corporation ("Manor Health Care"), Cenco, Inc. ("Cenco"), Almo, Inc. ("Almo"), and Marvin Jonas, Inc. ("Marvin Jonas").

### 1. *The Site*

The Lipari Landfill site occupies approximately 6 acres and is bordered by two streams: Chestnut Branch, which flows along the northern and northeastern borders, and Rabbit Run, which borders the Western area of the Landfill. Rabbit Run enters Chestnut Branch at a point on the northern border of the Landfill, and Chestnut Branch flows into Alcyon Lake approximately 1,000 feet downstream from the Landfill. The complaint alleges that there are occupied homes near the northeastern border of the Landfill, and that Alcyon Lake had been used for recreational purposes until it was closed for public health reasons.

According to the complaint, the site was operated as a landfill by its owner, Nick Lipari, from 1958 to 1971. During that time, the complaint alleges, hazardous chemical and industrial wastes were deposited at the site. Specifically, the plaintiff contends that every week from 1958 to 1970, Owens-Illinois disposed of approximately 200 gallons of paint thinner at the Landfill, that from 1968 to 1969, Marvin Jonas transported and disposed of approximately 46,000 55–gallon drums of chemicals from Rohm and Haas at the Landfill, and that from 1968 to 1969 Almo[1] transported approximately 30 1,000–gallon loads of record cutting solution from CBS to the Landfill. Hazardous substances disposed of at the Landfill have allegedly percolated into the groundwater under the Landfill and have migrated into Chestnut Branch, Rabbit Run, Alcyon Lake and the surrounding environment. The complaint alleges that these hazardous substances include the following: benzene, bis (2–chloroethyl) ether, 1, 1–dichloroethane, trichloroethylene, phenol, toluene, ethylbenzene, chlorobenzene, vinyl chloride, methylene chloride, arsenic, chromium, lead, zinc, chloroform, acrylontrile, acrolein, methyl chloride, 1, 1–dichloroethylene, beryllium, and mercury. In 1981 and 1982, the Lipari Landfill was ranked as the number one site in the country on the National Priorities List of serious hazardous waste sites promulgated pursuant to 42 U.S.C. § 9605.

### 2. *The Statutory Framework*

In CERCLA, Congress established a statutory scheme to ensure prompt and efficient clean-up of hazardous waste disposal sites. Under the statute, after determining that a response action is needed at a particular hazardous waste site, the EPA may undertake one of three possible courses of action. First, it may issue an administrative order directing the responsible party or parties to implement removal or remedial action. 42 U.S.C. § 9606. Second, it may apply to the district court for an injunction to compel the responsible party or parties to abate an actual or threatened release of hazardous substances from a facility. 42 U.S.C. § 9606. Third, the EPA may undertake the removal or remedial action on its own and then sue the responsible party or parties for reimbursement. 42 U.S.C. §§ 9604, 9607. In the present case, the EPA chose this last option.

Section 104 of CERCLA, 42 U.S.C. § 9604, authorizes the EPA to undertake responsive measures whenever there is a release or threatened release of hazardous substances into the environment. The EPA's response actions, which can take the form of removal of the hazardous substances, and/or remedial action at the site, is guided by the principles set forth in the National Contingency Plan ("NCP"), 40 C.F.R. Part 300. The NCP describes methods of investigating the environmental and health problems associated with a release of hazardous substances and provides criteria for determining the appropriate responsive measures. Specifically, the NCP re-

---

**1.** According to the complaint, Cenco acquired the assets and assumed the corporate liabilities of Almo subsequent to the disposal of wastes alleged. In 1983, Manor Health Care acquired the stock of Cenco.

quires, prior to initiation of remedial action at a site, that the EPA undertake a Remedial Investigation/Feasibility Study ("RI/FS") "to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies." 40 C.F.R. § 300.68(d). Based on the results of the RI/FS, the agency must select an appropriate, cost-effective remedy. 40 C.F.R. § 300.68(i).

EPA response actions under Section 104 are initially financed through the Hazardous Substance Response Trust Fund ("Superfund") created by Section 221 of CERCLA. The Government may recover its costs, however, in an action pursuant to Section 107(a), 42 U.S.C. § 9607(a). That section provides that the Government may recover, from responsible parties, "all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). Persons liable under Section 107(a) include:

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person....

42 U.S.C. § 9607(a). Liability under this section attaches to responsible parties subject only to limited, delineated defenses. *See* 42 U.S.C. § 9607(b).

### 3. *Remedial Activities at Lipari*

The EPA initiated remedial activities at the Lipari Landfill site in 1979, when it undertook an investigation to determine the extent and nature of the contamination. On August 3, 1982, after numerous other studies and investigations that will be described in greater detail below, the EPA issued its first Record of Decision ("ROD I"). According to the EPA, the ROD I embodied a two-phased approach for remedial work at the site: Phase I involved construction of a containment system, and Phase II involved treatment of contaminated groundwater within the site. The Phase I construction activity was completed by the EPA in 1984, at a cost of approximately $3.7 million. The ROD II, relating to the Phase II construction, is still apparently under consideration. (See Plaintiff's Reply Memorandum in Further Support of its Motion at p. 15.) The EPA also plans to issue and implement a third ROD relating to clean-up of off-site contamination.

### *Legal Analysis*

Presently before this court is a motion by the plaintiff for a pretrial ruling regarding the appropriate standard of review of the agency's choice of a remedial response and for an order limiting the scope of discovery on that issue. Plaintiff urges that we should confine our review to determining whether the agency's response action was "arbitrary, capricious or otherwise not in accordance with the law" based on the administrative record in existence, and that discovery on the issue should be limited accordingly. The defendants oppose this motion on the ground that application of the arbitrary and capricious standard is inconsistent with the statutory framework and violative of their constitutional right to due process. They argue that they are entitled to a full *de novo* hearing in this court regarding the appropriatness of the EPA's remedy.

Before turning to the questions raised by this motion, we will briefly note the issues that are *not* in dispute. First, the parties agree that the relief sought by this motion concerns only the consistency of the remedy selected by the EPA with the NCP. Other substantive issues in dispute in this § 9607(a) action, including whether the defendants are liable parties, and whether the

EPA actually incurred the costs it claims, will be subject to a *de novo* determination by this court. Moreover, at this point in time, the court will only address the issues raised by Phase I of the clean-up, inasmuch as that is the only aspect of the EPA's overall response action in which a completed ROD has been issued and response costs incurred.

■ Turning now to the issues that are raised by this motion, we must determine, as an initial matter, the significance of certain amendments to CERCLA that were enacted during the time that this motion was under consideration. On October 17, 1986, Congress enacted the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499 ("SARA"), amending CERCLA in several important respects. Section 113(j) of SARA specifically sets forth the procedure to be utilized in judicial actions under CERCLA. It provides as follows:

(j) JUDICIAL REVIEW—

(1) LIMITATION—In any judicial action under this Act, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

(2) STANDARD—In considering objections raised in any judicial action under this Act, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

(3) REMEDY—If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with the law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.

(4) PROCEDURAL ERRORS—In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not be made.

Defendants vigorously assert that it would be unfair to apply the judicial review provisions of SARA, which were enacted while plaintiff's motion was pending, to the present case. However, in general, "a court is to apply the law in effect at the time it rendered its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Yakim v. Califano,* 587 F.2d 149 (3d Cir. 1978); *Torres v. Harris,* 502 F.Supp. 518 (E.D.Pa.1980); 1A Sutherland Stat.Const. § 22.36 (4th Ed.). Applying this standard to the present case, we find, first, that there is no indication that Congress intended to limit the statute's application to cases commenced after its enactment. Although Section 4 of SARA provides, somewhat ambiguously, that "the amendments ... shall take effect on the enactment of this Act," other portions of the statute clearly indicate that Congress contemplated that SARA would apply to pending cases. For example, Section 113(k) of SARA, 42 U.S.C. § 9613(k), which requires the President to promulgate regulations concerning compilation of an administrative record during EPA's selection of a response action, also provides that in the interim, until such regulations are promulgated, "the administrative record shall consist of all items developed and received pursuant to the current procedures...." 42 U.S.C. § 9613(k)(2)(C). Moreover, the Conference Report states that "[t]he record for a response action selected prior to implementation of these regulations shall consist of the record developed prior to such implementation." H.R.Conf.Rep. No. 99–962, 99th Cong., 2d Sess. 224, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3276, 3317. The report by the House Committee on Energy

and Commerce which accompanied the House version of the bill (H.R. 2817) further explains, "To ensure that enforcement and cost recovery actions will not be delayed during the interim period while these regulations are being developed and implemented, *judicial review during this period should continue to be on the administrative record that has been assembled.*" H.R.Rep. No. 99–253(I), 99th Cong., 1st Sess. 82, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2864. Thus, it appears to us that Congress plainly intended that the judicial review provisions by Section 113(j) apply to ongoing cases.

Moreover, we perceive no manifest injustice in the application of SARA to the parties in this case. The amendments do not affect or change vested substantive rights of the parties, but merely modify their procedural rights and form of legal remedy. For all of these reasons, we find that SARA should be applied retroactively to the present case. *See, also, United States v. Nicolet,* No. 85–3060 (E.D.Pa., slip op. filed May 12, 1987) [Available on WESTLAW, DCT database] (applying § 113(j) of SARA to case pending at the time of its enactment.)

In reaching this conclusion, we must distinguish two cases relied on by the defendants. In *United States v. Royal N. Hardage, et al.,* 663 F.Supp. 1280, (W.D.Okla. 1987), the court refused to apply SARA to a pending action for injunctive relief brought under § 106 of CERCLA, 42 U.S.C. § 9606. In reaching this determination, the court simply stated, without discussion or analysis that

> The Court notes SARA became effective approximately four months subsequent to the date on which the complaint in the instant case was filed. As such, § 113(j) of SARA is inapplicable to the instant case. The Court believes retroactive application of such section is improper.

*Hardage, supra,* at 1283. The court further reasoned that even if it were to find that SARA applies retroactively, the judicial review provisions of § 113(j) did not apply to injunctive actions under § 106 of CERCLA. In *United States v. Ottati &*

*Goss, Inc.,* C. 80–225–L (D.N.H. order Nov. 14, 1986), the court also denied a motion by the government to apply the SARA judicial review provisions to a pending case. Although the court gave little explanation for its decision beyond stating that it would be "unfair" to grant the motion, (Transcript of hearing, Nov. 14, 1986, at p. 81) it appeared to be influenced by the fact that the motion was made after the liability issues had been determined at trial and after discovery on the remedy issues had taken place.

We are not persuaded by the decisions in *Hardage* or *Ottati & Goss* because those courts did not specifically analyze or address the retroactivity of SARA in light of the principles set forth in *Bradley, supra.* We are convinced, for the reasons set forth above, that SARA should apply to pending cases such as the present.

The defendants also argue that application here of the deferential standard of judicial review set forth in SARA would be violative of their constitutional right not to be deprived of property without due process. They point out that they have a substantial financial interest in the cost-effectiveness of the response action selected by the EPA, and they argue that they were not given an adequate opportunity, at the administrative level, to challenge the appropriateness of the remedy selected by the EPA. As a result, they urge that they are entitled to *de novo* review of the agency action in a full trial proceeding in this court.

In support of this argument, they point out that SARA, in addition to authorizing judicial review under the arbitrary and capricious standard, also explicitly mandates the development of hearing procedures before the agency to enable potentially responsible parties and affected citizens to participate in the selection of an appropriate response action and in the development of the administrative record. Specifically, § 113(k) of SARA, 42 U.S.C. § 9613(k) provides as follows:

> (k) ADMINISTRATIVE RECORD AND PARTICIPATION PROCEDURES—

(1) ADMINISTRATIVE RECORD.—The President shall establish an administrative record upon which the President shall base the selection of a response action. The administrative record shall be available to the public at or near the facility at issue. The President also may place duplicates of the administrative record at any other location.

(2) PARTICIPATION PROCEDURES.—

(A) REMOVAL ACTION.—The President shall promulgate regulations in accordance with Chapter 5 of title 5 of the United States Code establishing procedures for the appropriate participation of interested persons in the development of the administrative record on which the President will base the selection of removal actions and on which judicial review of removal actions will be based.

(B) REMEDIAL ACTION.—The President shall provide for the participation of interested persons, including potentially responsible parties, in the development of the administrative record on which the President will base the selection of remedial actions and on which judicial review of remedial actions will be based. The procedures developed under this subparagraph shall include, at a minimum, each of the following:

(i) Notice to potentially affected persons and the public, which shall be accompanied by a brief analysis of the plan and alternative plans that were considered.

(ii) A reasonable opportunity to comment and provide information regarding the plan.

(iii) An opportunity for a public meeting in the affected area, in accordance with section 117(a)(2) (relating to public participation).

(iv) A response to each of the significant comments, criticisms, and new data submitted in written or oral presentations.

(v) A statement of the basis and purpose of the selected action.

For purposes of this subparagraph, the administrative record shall include all items developed and received under this subparagraph and all items described in the second sentence of section 117(d). The President shall promulgate regulations in accordance with Chapter 5 of title 5 of the United States Code to carry out the requirements of this subparagraph.

(C) INTERIM RECORD.—Until such regulations under subparagraphs (A) and (B) are promulgated, the administrative record shall consist of all items developed and received pursuant to current procedures for selection of the response action, including procedures for the participation of interested parties and the public. The development of an administrative record and the selection of response action under this Act shall not include an adjudicatory hearing.

(D) POTENTIALLY RESPONSIBLE PARTIES.—The President shall make reasonable efforts to identify and notify potentially responsible, parties as early as possible before selection of a response action. Nothing in this paragraph shall be construed to be a defense to liability.

Defendants point out that prior to SARA's enactment, there were no statutory or administrative requirements regarding public participation in the agency's development of an appropriate response action. They argue further that they were given virtually no opportunity, in the present case, to present evidence to the agency or to contribute to the development of the administrative record. Specifically, defendant Rohm & Haas contends:

Rohm and Haas was denied the opportunity meaningfully to participate in the evaluation of remedial alternatives. It was never provided adequate information regarding what proposal EPA was actually considering in sufficient time to allow a detailed evaluation of scientific methods, data and conclusions and the preparation of a written response. Rohm and Haas and its consultants were repeatedly excluded from scientific data and other information relating to the Landfill that had been generated by EPA and its consultants. EPA issued no notices of draft and final reports in the

Federal Register, no notices of any proposed selection of alternatives, and never held a public hearing with respect to its proposed actions to provide Rohm and Haas the opportunity to present its own technical evidence and cross-examine EPA's witnesses. Because Rohm and Haas was not afforded a prior administrative hearing, the hearing before this court must be more than a pro forma proceeding....

(Defendant Rohm & Haas' Memorandum In Opposition to Motion by Plaintiff at 18).

In further support of their position, defendants rely on several cases decided prior to the enactment of SARA, in which courts expressed concern that a review of the EPA's choice of response action under an arbitrary and capricious standard of review, limited to the administrative record, might not satisfy the requirements of due process. In *Wagner Electricity Corp. v. Thomas*, 612 F.Supp. 736 (D.Kan.1985), the EPA issued an administrative order pursuant to § 106(a) of CERCLA, 42 U.S.C. § 9606(a), directing the plaintiffs to undertake certain remedial actions at the site. The plaintiffs were given three days to comment upon the proposed remedy, and they were subject to punitive damages if they failed to comply. The plaintiffs brought suit seeking a stay of the EPA's order on the ground that the potential penalties chilled the exercise of their right to challenge the order and thus violated due process. The court dismissed the suit, reasoning that the statute allowed the plaintiffs to assert their good faith objections to the order as a defense to punitive damages liability. Moreover, the court ruled that in the subsequent enforcement action, the plaintiffs would be entitled to produce evidence to establish that their defense was asserted in objective good faith. The court explained:

> Because their request for a hearing (with its accompanying oral argument, presentation of plaintiffs' witnesses, and cross-examination of EPA's witnesses) was denied, the administrative record has been created almost entirely by EPA. It therefore contains virtually no evidence that might exculpate these plaintiffs.

> Faced solely with this administrative record, a reviewing court would cast a skeptical eye on plaintiffs' claim to have asserted a good faith defense to the validity of the order.

> .... To limit a reviewing court to the administrative record, at least where no administrative hearing is required, would surely not be a 'meaningful manner' of affording aggrieved parties an opportunity to be heard. We conclude, therefore, that these plaintiffs are free to present to the reviewing court any evidence of their good faith in challenging the validity of this order.

*Wagner Electricity, supra,* at 747. *See, also, United States v. Reilly Tar & Chemical Corp.,* 606 F.Supp. 412 (D.Minn.1982).

The defendants contend that the present case should be controlled by the reasoning of *Wagner Electricity,* inasmuch as the agency action here occurred prior to the passage of SARA, at a time when there were no requirements setting forth participation procedures before the agency. Accordingly, the defendants contend that because they were not provided with a full adjudicatory hearing before the agency, due process requires *de novo* review in this court.

While we agree that defendants must be afforded some kind of a hearing prior to the assessment of costs against them, we do not believe that they are constitutionally entitled to the full, trial-type hearing that they seek. The flaw in defendants' argument is that it assumes that due process requires a complete adjudicatory hearing, with cross-examination, on the issue of the propriety of the response action. SARA itself contemplates a limited paper hearing before the agency, prescribing that "[t]he development of an administrative record and the selection of response action under this Act shall not include an adjudicatory hearing." § 113(k)(2)(C) of SARA, 42 U.S.C. § 9613(k)(2)(C). Moreover, in *Lone Pine Steering Committee v. EPA,* 777 F.2d 882 (3d Cir.1982), *cert. denied,* —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), the Third Circuit suggested that due process would be satisfied with a limited

agency hearing. In that case, a number of potentially responsible parties sought to enjoin EPA remedial action under § 104 of CERCLA on the ground that it was not the most cost-effective approach, and that they would not have the opportunity, in the § 107 reimbursement proceeding, effectively to challenge the EPA's action. The Third Circuit rejected the plaintiffs' argument that due process required pre-enforcement review, holding instead that the § 107 reimbursement hearing adequately protected the plaintiffs' rights. The court reasoned as follows:

> Section [107] provides an adequate opportunity for the alleged responsible parties to object to the cost and adequacy of response actions. Plaintiffs here contend they may be at a disadvantage in contesting the extent of the remedy after the fact, but we do not find that to be a constitutional deficiency. It is a problem shared with defendants in many civil actions where damages are sought. Indeed, we believe that alleged responsible parties under the statute may be in a somewhat better position to mitigate damages than a defendant in the routine civil case.
>
> Under [§ 104] the EPA has an obligation to work with the responsible parties in developing appropriate measures. The courts are not unaware of bureaucratic excesses and will undoubtedly look carefully at the claims made by the government when suit for reimbursement is brought under [§ 107]. We note that the Steering Committee has been consulted by the EPA throughout these proceedings, has secured its own cost estimates of proposed work, and has submitted plans to do some of the project. We assume all of these matters have or will become part of the agency record.
>
> Even if judicial review is limited to the agency record, a matter we explicitly do not decide here, plaintiffs are in a position to contribute to that record. They can observe the remedial project, submit pertinent comments or objections as the work progresses, and prepare for the [§ 107] suit. Continued monitoring of the EPA by the alleged responsible par-

ties and the prospect of a [§ 107] trial are adequate safeguards to insure that the agency gives serious consideration to objections and comments by the parties. The reimbursement trial will not be a pro forma proceeding but will permit presentation of adequate evidence for careful and exacting study by the court. The statute requires the EPA to observe cost effective-ness, and that mandate is a limitation, not a license to squander. We expect the recovery trial to utilize that approach.

*Lone Pine, supra,* at 887.

■ In determining the process that is constitutionally due in a particular case, a court must balance three factors: (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional safeguards; and (3) the government's interest, including the burdens that additional procedural requirements would entail. *Matthews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Applying these principles to the present case, we conclude that the informal hearing envisioned in SARA and implicitly endorsed in the *Lone Pine* case is sufficient to satisfy the requirements of due process. First, we recognize the important financial interest that potentially responsible parties have in the selection of a response action, particularly where the liability could amount to millions of dollars. However, there is an overwhelming countervailing public interest, as evinced in CERCLA, in effecting the expeditious clean-up of potentially health and life threatening hazardous waste sites. The imposition of long, drawn-out, and costly trial-type procedures, either at the agency level or in a *de novo* proceeding in district court, could greatly hinder this effort. Moreover, we are unconvinced that formal trial-type hearings would advance the defendants' interests in accuracy or equity.

With respect to this final issue, it is important to emphasize the nature of the agency decisionmaking at issue here. The agency's determination of an appropriate

response action involves inspections and testing aimed at discovering the types of waste present at a site and the extent of the hazard, and technical investigations to develop an appropriate solution to the problem. Congress vested a certain amount of discretion in the EPA in its choice of a response action, requiring only that the costs for which it seeks reimbursement be not inconsistent with the NCP. The ultimate selection of a response action depends upon a balancing, by the *agency*, of a number of factors, including cost, technology, reliability, and public health, welfare and environmental effects. *See* 40 C.F.R. § 300.68. Thus, the EPA's decision-making process at issue here need not involve a reconstruction of past events through eyewitness testimony and credibility judgments, as would be necessary where, for example, a liability determination was being made. Rather, the process involves the evaluation of numerous expert reports and technical data. As a result, the focus for purposes of due process analysis should be on whether interested parties have an opportunity to participate in the development of such information and technical data before the agency. Under these circumstances, where the parties are allowed to comment on the agency's proposals and to submit reports of their own experts, the quality of the initial decision-making process would not be greatly enhanced by the presentation of live testimony or the use of cross-examination.

Moreover, we believe that an administrative record built on such an exchange of opinions and comments by experts and informed citizens and containing an explanation by the agency of its reasons for accepting or rejecting the various proposals, provides an adequate basis for subsequent judicial review. Under such circumstances, the administrative record has not "been created almost entirely by the EPA.... [with] virtually no evidence that might exculpate" the defendants. *Wagner, supra*, at 747. Rather, it reflects the contemporaneous analyses and criticisms of all interested parties, and therefore provides a comprehensive framework from which the court can scrutinize the agency's action.

For all of these reasons, we conclude that SARA's informal agency hearing procedures, and deferential standard of judicial review satisfy the requirements of due process.

■ Having found that the agency hearing procedures of SARA are consistent with the requirements of due process, we must next determine whether the process afforded the defendants in the present case met the minimal standards set forth in SARA. As noted above, the defendants contend that they were given no process at the agency level—no notice of the agency's decision and no opportunity to comment. Our own review of the record leads us to conclude that the process was not as bleak as the defendants claim. Nevertheless, as we will explain, we are concerned about certain deficiencies in the procedures employed by the agency in developing the administrative record.

The EPA began its remedial activities at the Landfill site in 1979, when it initiated a number of studies to assess the extent and nature of the contamination. These initial studies culminated, according to the plaintiff, in an in-depth remedial investigation by EPA's consultant, R.E. Wright Associates ("Wright"). The EPA, in conjunction with Wright, developed a two-phased approach to the clean-up which was contained in a report released in October of 1980, and revised in September of 1981. (Administrative Record ("A.R.") Volumes 18 and 20.) According to plaintiff's brief, the EPA held a public meeting in November of 1981, at which it announced its phased approach, although there is no mention of this meeting or transcript of the proceedings in the Administrative Record. On December 29, 1981, the EPA held a meeting with defendants Rohm and Haas and Owens-Illinois to solicit comments on the Wright proposal, and in a letter dated January 4, 1982, these defendants were given until January 25, 1982 to submit comments in writing. (A.R. Volume 3, No. 14) On January 25, 1982, defendants Rohm and Haas and Owens-Illinois submitted the preliminary report by their consultant, Betz, Converse and Murdoch ("BCM") on the Wright proposal.

(A.R. Volume 3, No. 17). On March 9, 1982, the EPA met with Rohm and Haas and BCM to discuss the BCM comments. The Administrative Record does not contain a transcript of the meeting, although it does include minutes and comments prepared by the EPA. (Vol. 3, No. 21 by Administrative Record). On March 20, 1982, EPA's consultant submitted a written response to the BCM report. (Vol. 3, No. 18 of Administrative Record).

By letter dated March 23, 1982, the EPA notified defendants Rohm and Haas, Owens-Illinois, Cenco, Marvin Jonas, and CBS that they had been identified as potentially responsible parties and could be held liable for the cost of the clean-up. The letter further offered them the opportunity to develop and implement their own remedial plan, and gave them 45 days to submit their proposals. On March 31, 1982, defendant Marvin Jonas responded, stating that it had not been given an adequate opportunity to study the EPA's proposal, and that it was unable to develop its own plan in the time provided. (A.R. Vol. 3, No. 20). On April 23, 1982, defendants Rohm and Haas and Owens-Illinois submitted a supplemental report by BCM. (A.R. Vol. 3, No. 25). These defendants also apparently submitted, in May of 1982, copies of a Preliminary Engineering Study of the Lipari Landfill prepared by BCM; however, the court has been unable to locate this document in the Administrative Record. (See Attachment # 11 to Affidavit of Salvatore Badalamenti).

The EPA undertook another feasibility study in May of 1982 in conjunction with another consultant, the Radian Corporation ("Radian"). The resulting report evaluated 32 alternatives for remedial action, including the BCM proposal. (A.R. Vol. 28). Radian also issued an Environmental Assessment (A.R. Vol. 27), and written comments to BCM's Preliminary Engineering Study (A.R. Vol. 3, No. 30).

The EPA held a public hearing to announce the recommended alternative on July 23, 1982. The potentially responsible parties were not given individual notice of this meeting, although it appears that de-

fendant Rohm and Haas was present. (Attachment 6 to Badalamenti Affidavit). The Radian Study was released to the public and defendants at the meeting, and all parties were given five days to submit comments. (A.R. Vol. 4, No. 28). No transcript or minutes of the public meeting appear in the Record.

By letter dated July 30, 1982, Rohm and Haas requested a meeting with the EPA to present further comments on the Radian Study. On August 3, 1982, the EPA issued the ROD I. (A.R. Vol. 4, No. 31). On August 25, 1982, the EPA met with Rohm and Haas and BCM to discuss the defendant's concerns regarding the Radian proposal, and the EPA concluded that the issues raised did not merit revision of the R.O.D. (A.R. Vol. 4, No. 47).

After carefully reviewing the evidence in the Administrative Record of the defendants' participation in the response action selection process, we conclude that the hearing procedures provided by the EPA did not quite comply with the minimal requirements set forth in SARA. As described above, SARA requires adequate notice to potentially affected persons, an opportunity to comment on the proposed action, a recorded public meeting, agency response to the comments, criticisms, and new data submitted, and agency explanation of the selected action. *See* § 113(k)(2)(B) of SARA, 42 U.S.C. § 9613(k)(2)(B). While it appears that at least two of the defendants, Rohm and Haas and Owens-Illinois, were given ample opportunity to review EPA proposals and to submit their own analyses prior to the EPA's selection of a remedy, we are not satisfied that Rohm and Haas, Owens-Illinois or the other named defendants received all of the procedural protections set forth in SARA. First, it appears from the record before us that the defendants did not receive notice of the selected remedy "accompanied by a brief analysis of the plan and alternative plans that were considered" § 113(k)(2)(B)(i) of CERCLA, 42 U.S.C. § 9613(k)(2)(B)(i), until the July 23, 1982 public meeting, and there is no evidence in the record that the defendants even received individual notice of the public

meeting. Moreover, after the July 23 meeting, the EPA allowed the defendants and the public only five days to submit comments. This short period of time is not consistent with SARA's requirement that the EPA "[p]rovide a *reasonable* opportunity for submission of written and oral comments...." § 117(a)(2) of CERCLA, 42 U.S.C. § 9617(a)(2), incorporated by reference in § 113(k)(2)(B)(iii) of CERCLA, 42 U.S.C. § 9613(k)(2)(B)(iii), (emphasis added). Finally, we believe that the administrative record may be incomplete, inasmuch as it does not contain any comments provided by the defendants or the public at the public hearing (apparently no transcript was made) and it does not contain one of the reports submitted by the defendants' consultant. *See* § 117(d) of CERCLA, 42 U.S.C. § 9617(d), incorporated by reference in § 113(k)(2)(B) of CERCLA, 42 U.S.C. § 9613(k)(2)(B).

It is not immediately obvious, however, what this court's response should be in light of the identified deficiencies in the administrative process. Plaintiff urges us to employ an arbitrary and capricious standard of review based on the administrative record already complied by the agency. There is support for this course of action in SARA, which provides that until regulations are promulgated under the statute, "the administrative record shall consist of all items developed and received pursuant to current procedures for selection of the response action...." § 113(k)(2)(C) of SARA, 42 U.S.C. § 9613(k)(2)(C). On the other hand, defendants argue that the agency's proceedings were so flawed that *de novo* review is required. They point to a Senate Committee Report accompanying SARA which provides:

> If major deficiencies are shown to exist in the administrative record that has been assembled, judicial review of the response in an enforcement or cost recovery action may be *de novo,* i.e. open to the introduction of evidence by all parties.

S.Rep. No. 11, 99th Cong., 1st Sess. 57 (1985). The Supreme Court has also recognized that the district court has the authority, in actions governed by the Administrative Procedures Act, 5 U.S.C. § 101, *et seq.,* to engage in *de novo* review "when the action is adjudicatory in nature and the agency fact-finding procedures are inadequate." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

We do not believe, however, that either option proposed—review on the present record or *de novo* review—is appropriate in light of the unique circumstances present in this case. Response measures in this case commenced prior to CERCLA's enactment, and the initial hearing stages were conducted before the NCP was promulgated. In addition, of course, the first phase of the clean-up was completed, and the recovery suit filed, before SARA came into existence. As a result, the agency's hearing and decision-making procedures throughout were necessarily innovative and ad hoc. Nevertheless, it is clear from our review of the record that the EPA did notify potentially responsible parties of the problem promptly, and did attempt to involve them in its development of an appropriate response action. The flaws which we have identified in the administrative process relate to the completeness of the administrative record as a basis for judicial review. In other words, we are concerned that the present administrative record may not reflect all of the factors that the agency should have taken into consideration before reaching a final decision, because the parties were not given an adequate opportunity to present those factors to the agency. This defect prevents us from strictly limiting our review to the record already compiled by the agency. However, we are also not compelled to engage in *de novo* review. Where inadequacies in an administrative record frustrate proper judicial review of the agency's actions under the arbitrary and capricious standard, the proper course is to remand the case to the agency, or to allow supplementation of the record in district court. *Florida Power & Light Co. v. Florion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 93

S.Ct. 1241, 36 L.Ed.2d 106 (1972); *ASARA-CO v. EPA,* 616 F.2d 1153 (9th Cir.1980).

■ In the present case, we believe that remand is appropriate. First, given the unusual procedural posture of this case, remand will benefit all parties in that it will enable them to develop the record with the full panoply of procedures afforded by SARA. Moreover, the agency, with its expertise in environmental issues, is in a far better position than this court to gather the supplemental evidence as an initial matter and to develop the record expeditiously and efficiently.

For all of these reasons, the case will be remanded to the EPA for further development of the administrative record for Phase I of the clean-up in accordance with the provisions of SARA. At the agency hearing, the arguments and presentations of the parties should be confined to the facts and circumstances in existence at the time the plan would have been noticed had the SARA procedures been followed throughout. The EPA should also respond to the new submissions in the manner prescribed by § 113(k)(2)(B)(iv). When the complete record is submitted to this court, we will limit our review to determining whether the EPA's choice of a response action was arbitrary, capricious or otherwise not in accordance with the law.

We note that since the initiation of this lawsuit, the EPA has identified other potentially responsible parties who have not yet been joined formally as parties to the action. This raises a potential constitutional question concerning the adequacy of SARA's judicial review procedures as applied to parties who had no opportunity to participate in the process before the agency. Given our disposition of plaintiff's motion, however, we need not reach this difficult issue. The EPA is directed to include, in the hearing we have ordered, *all* potentially responsible parties that the agency intends, in the future, to name as defendants in this case.

Defendants also argue that even if we apply an arbitrary and capricious standard of review to the EPA's choice of a response action, we can still consider evidence outside of the administrative record under applicable principles of administrative law. We need not rule on this issue now, given our decision to remand the action for further supplementation of the record. Defendants may renew this argument, with appropriate factual and legal support, should they desire, after the fully developed Administrative Record is certified to this court.[2]

The EPA is directed to proceed expeditiously with the hearing on the appropriateness of the Phase I response action. This court will retain jurisdiction over other aspects of the litigation in order to supervise discovery on liability issues and the ongoing settlement discussions.

Counsel for the plaintiff shall submit an order consistent with this opinion.

---

**2.** Defendants are advised, however, that they are expected to participate fully in the administrative hearing that has been ordered. This court will closely scrutinize subsequent requests to supplement the administrative record due to its alleged deficiencies now that the defendants are being given the opportunity to contribute to the record at the agency level.