UNITED STATES of America, Plaintiff,

v.

IRON MOUNTAIN MINES, INC.,
et al., Defendants.

No. CIV–S–91–768 DFL JFM.

United States District Court,
E.D. California.

Sept. 30, 1997.

Paul B. Galvani, James W Matthews, Ropes and Gray, Boston, MA, for Rhone–Poulenc Inc.

Thomas H. Hannigan Jr., Ropes and Gray, Boston, MA, for Rhone–Poulnec Basic Chemicals Co.

Michael Brian Hingerty, U.S. Environmental Protection Agency, San Francisco, CA, David B Glazer, Environmental Enforcement Section, San Francisco, CA, Yoshinori HT Himel, United States Attorney, Sacramento, CA, Martin F McDermott, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for U.S.

Thomas G Redmon, Wilke Fleury Hoffelt Gould and Birney, Sacramento, CA, for Rhone–Poulenc Basid Chemicals Co.

Margarita Padilla, California State Attorney General, Oakland, CA, Sara J. Russell, Attorney General's Office of the State of California, Oakland, CA, for State of California.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

The United States moves to limit review of certain response actions selected by the Environmental Protection Agency ("EPA") for the Iron Mountain Mine site to the administrative record. At issue are two Records of Decision, referred to as RODs, specifically ROD 1, which was issued in 1986, and ROD 2, which was issued in 1992 .[1] The United States also seeks to preclude supplementation of the record by defendant Rhñe–Poulenc Basic Chemicals Company, Inc. The State of California joins the motion. Rhône–Poulenc opposes on the ground that discovery in this case has revealed "a shocking scenario of abuse of power by EPA" and cross moves on the same issues.[2] R–P Mem & Opp'n at 1.

## I.

The Iron Mountain Mine site was listed on the National Priorities List in 1983. Since that time, EPA has been investigating, designing, and implementing responses to the environmental pollution at the site.

From 1983 until 1985, EPA conducted its initial Remedial Investigation ("RI"), which characterized the Iron Mountain Mine site and the pollution found there, and developed its initial Feasibility Study ("FS"), which described and evaluated possible cleanup measures. See 40 C.F.R. §§ 300.68(d), 300.430. Rhône–Poulenc declined to participate in the RI/FS process.[3] Sugarek Decl., ¶ 23. In August 1985, EPA issued the FS for public comment. R–P Exh. 1 at 1. The 1985 FS presented six remedial alternatives. On July 25, 1986, the FS was amended by an FS Addendum that included a proposal to fill the mine workings with low-density cellular concrete. R–P Exh. 1 at 1. Rhône–Poulenc submitted comments on the proposed remedies in the FS and the FS Addendum.[4] Erickson Decl., ¶ 4. EPA responded to all of Rhône–Poulenc's comments, whether they were submitted within the formal public comment period or afterward. Sugarek Decl., ¶¶ 26–28.

On October 3, 1986, EPA issued ROD 1, which formally selected certain interim cleanup measures including: (1) a cap over selected parts of the site; (2) a series of water diversions intended to divert clean water from upstream around the area affected by the acid mine drainage; (3) an evaluation of the feasibility of filling the underground mine workings with low-density concrete; and (4) the enlargement of Spring Creek Debris Dam to 9,000 acre feet, but only if necessary after the other remedies were constructed and evaluated for their effectiveness.[5] R–P Exh. 1.

1. EPA has issued three RODs, selecting responses to be implemented at the Iron Mountain Mine site, and EPA's issuance of a fourth ROD is upcoming. Neither ROD 3 nor the upcoming ROD 4 are at issue in these cross motions.

2. Both parties move to strike portions of the declarations offered by the other. Rhône–Poulenc moves to strike portions of the declaration of Richard Sugarek, EPA's project manager for the Iron Mountain Mine site and the person responsible for compiling the administrative record for ROD 1 and ROD 2. The court has only relied upon Sugarek's declaration to the extent it catalogs what was included in the administrative record, a subject on which he is eminently qualified to speak. Rhône–Poulenc also moves to strike the declaration of Andrew Lincoff to the extent that it expresses an opinion regarding the viability of Rhône–Poulenc's plugging alternative, which is discussed below. Because the court does not rely upon Lincoff's declaration on the issue of whether Rhône–Poulenc's plugging alternative was viable, there is no need to strike the declaration. Finally, the United States moves to strike portions of the declarations of

Lee Erickson, who was Manger of Environmental Control at Stauffer Chemical, Rhône–Poulenc's predecessor, on the ground that he lacks personal knowledge. However, it is apparent from the declaration that Erickson has sufficient personal knowledge to support those portions of the declaration on which the court has relied.

3. In its dealings with EPA, Rhône–Poulenc acted through Imperial Chemical Industries PLC and its affiliates, principally the Stauffer Management Company. For the sake of simplicity, throughout this memorandum all subsidiaries and agents of Rhône–Poulenc are referred to as Rhône–Poulenc.

4. Iron Mountain Mines, Inc. and T.W. Arman also submitted comments, and otherwise participated in the administrative process leading to the issuance of ROD 1. Sugarek Decl., ¶¶ 30–36.

5. Rhône–Poulenc alleges that, to date, EPA has spent at least $ 9 million on work associated with the design of the Spring Creek Dam enlargement, even though ROD 1 does not actually

EPA delayed implementing ROD 1 for 60 days so that Rhône–Poulenc and other potentially responsible parties ("PRP") could submit alternative remedies. Ultimately, EPA rejected the alternative remedies proposed by the PRPs. Moreover, EPA ultimately abandoned some of its own selected remedies, such as the low-density cellular concrete remedy. Erickson Decl., ¶¶ 7, 8.

The administrative record for ROD 1 was compiled and indexed in 1988. Sugarek Decl., ¶ 13. The administrative record is made up of 359 documents. Sugarek Decl., ¶ 14. Included in the administrative record are reports on the data collected at the Iron Mountain Mine site; the RI/FS and documents relating to the development of the RI/FS; documents relating to the development of alternative remedies; and documents pertaining to meetings, correspondence, and other communications between EPA and other state and federal agencies. Sugarek Decl., ¶¶ 15, 20. The administrative record also includes comments and proposals submitted by Rhône–Poulenc and the other PRPs, as well as EPA's responses to those comments and proposals. Sugarek Decl., ¶¶ 15, 16. Approximately one-third of the documents in the administrative record were either submitted by or addressed to Rhône–Poulenc or one of the other PRPs. Sugarek Decl., ¶ 19.

On September 30, 1992, EPA issued ROD 2 to address acid mine drainage discharging from the underground mine workings, through the Richmond and Lawson Portals, into the Boulder Creek watershed. Rhône–Poulenc participated extensively throughout the entire remedy selection process. Indeed,

EPA deferred issuing ROD 2 for approximately one year to allow Rhône–Poulenc an extended opportunity to collect site data, perform engineering studies, and develop and evaluate remedial alternatives. Sugarek Decl., ¶ 54. Rhône–Poulenc's participation included the submission of its own RI/FS and the presentation of its alternative cleanup plan at a public meeting convened by EPA to present EPA's proposed plan. Sugarek Decl., ¶ 49. The alternative plan proposed by Rhône–Poulenc was to plug all of the mine portals, permit the underground mine workings to fill with water, and then neutralize the water. Erickson Decl., ¶ 11. In ROD 2, EPA ultimately rejected Rhône–Poulenc's alternative plan in favor of: (1) the collection and treatment of acid mine drainage from the Richmond and Lawson Portals; (2) the disposal of sludge generated by the treatment plant; and (3) the capping of seven waste piles.[6] R–P Exh. 36 at 3–4.

As with ROD 1, the administrative record for ROD 2 was compiled and indexed by Rick Sugarek. Sugarek Decl., ¶ 38. It consists of 2,648 documents and includes the same types of documents as the record for ROD 1. Sugarek Decl., ¶¶ 38, 43. Again, many of the documents in the administrative record—approximately 20 percent—were either submitted by or addressed to Rhône–Poulenc or one of the other PRPs. Sugarek Decl., ¶ 45.

II.

■ Section 113(j) of CERCLA provides that judicial review of EPA's remedy selection decisions must be based on the administrative record, applying the arbitrary and capricious standard.[7] 42 U.S.C. § 9613(j); *see Washington State Dept. of Transporta-*

---

select the Spring Creek Dam enlargement but provides that the dam enlargement will only be considered if the other selected remedies fail to improve the water quality sufficiently. Rhône–Poulenc further alleges that the EPA's design is for a 15,000 acre foot enlargement, as opposed to the 9,600 acre-foot enlargement contemplated in ROD 1. Erickson Decl., ¶ 9. It is unclear whether the Spring Creek Dam enlargement will be formally selected in the upcoming ROD 4. *See* Erickson Decl., ¶ 9.

6. ROD 2 did not address where the treatment plant would be located. Erickson Decl., ¶ 15. EPA later chose to locate it at Minnesota Flats—a decision Rhône–Poulenc contends has cost it millions in sludge hauling expenses. Erickson Decl., ¶ 16

7. Section 113(j)(1) of CERCLA, entitled "Judicial review," provides:

(1) Limitation
In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President [through EPA] shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.
(2) Standard
In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that

tion v. Washington Natural Gas Co., 59 F.3d 793, 802 (9th Cir.1995) (applying 42 U.S.C. § 9613(j)); United States v. Princeton Gamma–Tech, Inc., 817 F.Supp. 488, 491 (D.N.J1993); but see United States v. Hardage, 663 F.Supp. 1280 (W.D.Okla.1987). An agency's decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise.

Inland Empire Public Lands Council v. Glickman, 88 F.3d 697 (9th Cir.1996) (quoting Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The factors that Congress intended EPA to consider when selecting a remedy under CERCLA are set forth in the national contingency plan ("NCP"). See 42 U.S.C. § 9604(a)(1).

In providing for deferential review on the administrative record, CERCLA conforms to established rules of administrative law. Princeton Gamma–Tech, 817 F.Supp. at 492 (citing the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)); United States v. Seymour Recycling Corp., 679 F.Supp. 859, 861 (S.D.Ind.1987) (citations omitted). The statutory rule of deference reflects Congress' judgment that, unlike a reviewing court, the EPA has the specialized knowledge and expertise needed to choose the appropriate cleanup method. Washington Natural Gas, 59 F.3d at 802; United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1424

(6th Cir.1991); Princeton Gamma–Tech, 817 F.Supp. at 491–93.

### A. Constitutionality of § 113(j)

■ Rhône–Poulenc challenges § 113(j) on the ground that it violates Article III and the Due Process Clause of the Constitution.[8] Neither of these constitutional challenges is persuasive. EPA's remedy selection process does not violate Article III because it is subject to judicial review, albeit deferential review, and because remedy selection by the EPA does not threaten the integrity of the judicial role in our scheme of government. See e.g., Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 587, 105 S.Ct. 3325, 3337, 87 L.Ed.2d 409 (1985) ("when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative branches,' the danger of encroaching on the judicial powers is reduced") (citations omitted).[9]

■ Rhône–Poulenc's due process argument has been addressed and rejected twice already in this litigation by Judge Schwartz. Other courts have come to the same conclusion. Seymour Recycling, 679 F.Supp. at 863–65; United States v. Rohm & Haas Co., Inc., 669 F.Supp. 672, 679–80 (D.N.J.1987). "The constitutional requirement of due process is flexible and 'calls for such procedural protections as the particular situation demands.'" Seymour Recycling, 679 F.Supp. at 864–65 (quoting Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). As the court explained in Rohm & Haas, 669 F.Supp. at 680–81, EPA's remedy selection processes provide adequate procedural protections to a PRP without providing a formal trial-type adjudication:

> Congress may from time to time ordain and establish." U.S. Const., art. III, § 1. The Due Process Clause provides "[n]o person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. Const., amend. V.

the decision was arbitrary and capricious or otherwise not in accordance with law.
(3) Remedy
If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.
42 U.S.C. § 9613(j).

8. Article III, § 1 provides that the "judicial Power of the United States shall be vested in one supreme Court and in such inferior Courts as the

9. Rhône–Poulenc cites Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), in support of its position that EPA's remedy selection process violates Article III. Schor, however, rejected the argument that only Article III courts can adjudicate common law claims related to a matter under the purview of an administrative agency.

In determining the process that is constitutionally due in a particular case, a court must balance three factors: (1) the private interest at stake; (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional safeguards; and (3) the government's interest, including the burdens that additional procedural requirements would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. Applying these principles to the present case, we conclude that the informal hearing envisioned in [CERCLA] ... is sufficient to satisfy the requirements of due process. First, we recognize the important financial interest that potentially responsible parties have in the selection of a response action, particularly where the liability could amount to millions of dollars. However, there is an overwhelming countervailing public interest, as evinced in CERCLA, in effecting the expeditious clean-up of potentially health and life threatening hazardous waste sites. The imposition of long, drawn-out, and costly trial-type procedures, either at the agency level or in a de novo proceeding in district court, could greatly hinder this effort....

[I]t is important to emphasize the nature of the agency decisionmaking at issue here. The agency's determination of an appropriate response action involves inspections and testing aimed at discovering the types of waste present at a site and the extent of the hazard, and technical investigations to develop an appropriate solution to the problem. Congress vested a certain amount of discretion in the EPA in its choice of a response action, requiring only that the costs for which it seeks reimbursement be not inconsistent with the NCP. The ultimate selection of a response action depends upon a balancing, by the agency, of a number of factors, including cost, technology, reliability, and public health, welfare and environmental effects. See 40 C.F.R. § 300.68. Thus, the EPA's decision-making process at issue here need not involve a reconstruction of past events

through eyewitness testimony and credibility judgments, as would be necessary where, for example, a liability determination was being made. Rather, the process involves the evaluation of numerous expert reports and technical data. As a result, the focus for purposes of due process analysis should be on whether interested parties have an opportunity to participate in the development of such information and technical data before the agency. Under these circumstances, where the parties are allowed to comment on the agency's proposals and to submit reports of their own experts, the quality of the initial decision-making process would not be greatly enhanced by the presentation of live testimony or the use of cross-examination.

The *Rohm & Haas* court also explained that the resulting administrative record would provide an adequate basis for judicial review because it would be the product of a process that would include the exchange of opinions and comments by all interested parties.

B. *Rhône–Poulenc's Constitutional Attack on EPA's Procedures Followed in ROD 1 and ROD 2*

■ In addition to its facial attack on the statutory scheme, Rhône–Poulenc argues that EPA's conduct of the procedures in this case fell short of the requisites of due process. First, Rhône–Poulenc argues that EPA only gave Rhône–Poulenc three weeks to review the low-density cellular concrete proposal that had been added to the FS for ROD 1 by addendum. R–P Mem. & Opp'n at 8–9. However, the court finds that the three week time limitation did not violate due process. The low-density concrete proposal was not central to ROD 1, and according to Rhône–Poulenc was "obvious[ly]" a "frivolous escapade." R–P Mem. & Opp'n at 9. Given that Rhône–Poulenc was versed on all of the issues relating to remediation of Iron Mountain surely its experts did not need more than three weeks to comment on a "frivolous escapade," and in fact Rhône–Poulenc did submit comments on the FS Addendum.[10]

■ Rhône–Poulenc also argues that it did not have the opportunity to participate in

10. A low-density cellular concrete pilot study was included in ROD 1. After the study, EPA rejected the proposal. According to Rhône–Poulenc, the cost of studying the low-density concrete by the time EPA abandoned it was approximately $ 1 million.

EPA's remedy selection decisions because the government destroyed selected pertinent documents and otherwise skewed the administrative record to support EPA's remedy selection decisions. Rhône–Poulenc contends that its ability to comment on EPA's findings and proposals was thereby hindered. While "[t]he ability to comment on the government's evidence in a meaningful manner depends, in large part, on accessibility to that evidence," *Seymour Recycling*, 679 F.Supp. at 864, Rhône–Poulenc does not show that it was denied access to any documents EPA relied upon in selecting remedies in RODs 1 and 2.

■ Rhône–Poulenc cites five instances where EPA allegedly rewrote drafts or destroyed notes relating to ROD 1 and ROD 2. R–P Mem. & Opp'n at 29. As an initial matter, five such instances seems rather insignificant when considered in the context of an administrative record made up of thousands of documents. Moreover, the instances Rhône–Poulenc cites are not compelling.

First, Rhône–Poulenc alleges that Richard Sugarek ordered Robert Dewey of the United States Bureau of Reclamation to rewrite a report, the draft of which revealed that EPA had selected the size of the Spring Creek Debris Dam enlargement before any ROD reflected the selection of an enlargement. But nothing in the memorandum suggests that Sugarek was trying to hide that fact. Indeed, Sugarek instructed Dewey to add a paragraph stating that "[a]lthough no formal decision has yet been made, ... the design study was well underway" for a 75 foot embankment enlargement. R–P Exh. 28. Second, Rhône–Poulenc alleges that Daniel Fults, Regional Director of the Department of the Interior, directed David Vogel of CH2M Hill to remove language regarding dams owned by the government from the draft Environmental Endangerment Assessment ("EEA"). In his letter, Fults wrote: "this EEA is supposed to address the endangerment to fish and wildlife from the AMD at the Site." R–P Exh. 23. The final EEA did, in fact, focus exclusively on AMD emanating from Iron Mountain Mine. The stated objective of the EEA was "to perform an assess-

ment of the endangerment to the environment posed by contaminants released from Iron Mountain Mine" to assist in "selecting and evaluating remedial actions for the site." R–P Exh. 24 at 1–1. Given that objective, Fults' instructions do not seem insidious, irrational, or somehow to implicate due process. Third, Rhône–Poulenc alleges that CH2M Hill instructed its employees and advised federal employees not to mark on any drafts prepared in connection with the selection or design of remedies for the Iron Mountain Mine site. What Rhône–Poulenc fails to mention is that CH2M requested that its employees "provide review comments separately" in lieu of returning marked-up drafts. R–P Exh. 29. Fourth, Rhône–Poulenc alleges that Dennis Heiman, a State of California employee, testified that he was pressured to conform his views to EPA's with regard to the Spring Creek Debris Dam. In fact, Heiman repeatedly testified that he did not recall anyone pressuring him. R–P Exh. J (Heiman Dep. 138:3 – 140:4). Finally, Rhône–Poulenc cites the "Doebbler memo" which instructs USBR employees to avoid putting their thoughts in writing because Rhône–Poulenc later could use written memoranda against USBR in this litigation. R–P Exh. 26. But the "Doebbler memo" cannot have skewed the process of compiling the ROD 1 and ROD 2 administrative record because the memo was written November 2, 1994—well after ROD 1 and ROD 2 were issued.

■ Furthermore, even if EPA failed to include all of its notes and drafts in the administrative record, it does not follow that Rhône–Poulenc's due process rights are thereby violated. Due process requires only that Rhône–Poulenc be given the opportunity to comment on the evidence that the administrative agency considered in reaching its decision. In the case of a ROD, that evidence generally would be the RI, the FS, other reports prepared by EPA and other governmental agencies (or their consultants), the data supporting EPA's conclusions in those documents, as well as the comments submitted by the public, including comments submitted by the PRPs, and EPA's responses to those comments.[11] *See Seymour Recycling,*

---

11. ROD 1 explicitly states that the documents relied upon in selecting the remedies were: (1)

the Final Remedial Investigation Report pre-

679 F.Supp. at 863–64; *Rohm & Haas,* 669 F.Supp. at 682–83 (due process violated where some PRPs not given notice of selected remedy "accompanied by a brief analysis of the plan and alternative plans that were considered"). Here, the administrative record includes all of this evidence.[12]

This common-sense division between evidence that would be central to EPA's decision and notes and drafts is recognized by the CERCLA statutory scheme. The 1990 NCP provides:

> The lead agency is not required to include documents in the administrative record file which do not form a basis for the selection of the response action. Such documents include but are not limited to draft documents, internal memoranda, and day-to-day notes of staff unless such documents contain information that forms the basis of selection of the response action and the information is not included in any other document in the administrative record file.

40 C.F.R. § 300.810(b); *see Seattle Audubon Soc. v. Lyons,* 871 F.Supp. 1291, 1308–09 (W.D.Wash.1994) (finding that the administrative record was "legally sufficient" even though "[t]housands of pages of notes, memoranda, and other working documents and electronic communications were destroyed"); *Town of Norfolk v. U.S. Army Corps of Engineers,* 968 F.2d 1438, 1456 (1st Cir.1992) (citing *Nat'l Wildlife Fed'n v. Burford,* 677 F.Supp. 1445, 1457 (D.Mont.1985)) (finding that the contents of personal files and notes of government employees were not properly part of the administrative record).

■ Finally, Rhône–Poulenc argues that it was denied due process because it was deprived of an honest, independent decisionmaker. *See Stivers v. Pierce,* 71 F.3d 732,

741 (9th Cir.1995) (citing *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). Rhône–Poulenc contends that EPA was incapable of rendering an honest, independent decision because of two potential conflicts of interest. First, according to Rhône–Poulenc, two federal administrative agencies—namely the Bureau of Reclamation and the Forest Service—are potentially liable for a portion of the environmental damage at and around the Iron Mountain Mine site.[13] R–P Mem. & Opp'n at 21–27; R–P Opp'n & Reply at 6. Rhône–Poulenc reasons that, because EPA is also part of the executive branch of the federal government, it must have been biased in its decisionmaking because of its desire to shift liability away from the government. Second, Rhône–Poulenc argues that CH2M Hill—the consultant that conducted the studies and collected the data that, for the most part, formed the basis for EPA's remedy selection decisions—also had conflicts of interests. R–P Mem. & Opp'n at 27–29. CH2M Hill performed work for owners of other mines that also discharged metals into the Upper Sacramento River. These other engagements, according to Rhône–Poulenc, would bias CH2M Hill toward shifting liability onto Rhône–Poulenc. In addition, Rhône–Poulenc suggests that because CH2M Hill designed, constructed, and implemented some of the remedies it recommended for the Iron Mountain Mine site, it had an incentive to encourage EPA to adopt its proposed remedies over Rhône–Poulenc's alternative remedies.

■ But a decisionmaker's integrity and honesty is only undermined where that decisionmaker has a "direct, personal, substantial pecuniary interest" in the outcome of the decision. *Stivers,* 71 F.3d at 743 (quoting

---

pared by CH2M Hill; (2) the Public Comment Feasibility Study prepared by CH2M Hill; (3) the Public Comment Feasibility Study Addendum; (4) the Responsiveness Summary; and (5) the Summary of Remedial Alternative Selection. R–P Exh. 1.

**12.** The United States concedes that not every public comment was included in the administrative record, but all public comments were summarized at 1986 AR 332, which is included in the administrative record. *See* Sugarek Decl., ¶ 17.

**13.** The Bureau of Reclamation owns and operates a number of dams near the Iron Mountain

Mine site. According to Rhône–Poulenc, these dams have wreaked havoc on the Sacramento salmon fishery and have exacerbated the AMD problem by restricting the flow of water to the Sacramento River. The Forest Service owns Golinsky Mine which Rhône–Poulenc alleges has contributed to the AMD. The United States disputes Rhône–Poulenc's factual assertions, as well as its legal conclusion that the Bureau of Reclamation and the Forest Service might be liable for a portion of the environmental damage. U.S. Opp'n & Reply at 13–18.

*Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 822, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986)); *see generally Commonwealth of the Northern Mariana Islands v. Kaipat,* 94 F.3d 574 (9th Cir.1996) (discussing Supreme Court caselaw on decisionmaker bias). Rhône–Poulenc does not contend that EPA will gain or lose financially depending upon the remedies selected for the·Iron Mountain Mine site; rather Rhône–Poulenc asserts that other federal agencies,and CH2M Hill will be the winners or losers. These rather speculative assertions are insufficient to establish possible bias by EPA or to overcome the presumption of the agency's honesty and integrity that otherwise prevails. *See Stivers v. Pierce,* 71 F.3d at 741. *Compare Allied–Signal,* 736 F.Supp. at 1558 (finding CERCLA remedy selection process violated defendant's due process rights where Navy was potentially responsible for environmental damage and where Navy formulated the remedial plan). In short, Rhône–Poulenc's right to an unbiased decisionmaker was not violated.

For the reasons stated above, the court finds that Rhône–Poulenc's due process argument fails and that it is not entitled to de novo judicial review based on any constitutional defect in § 113(j)(1) or the particular procedures followed by EPA in developing ROD 1 and ROD 2.

C. *Citizens to Preserve Overton Park, Inc v. Volpe*

■ Alternatively, Rhône–Poulenc argues that it is entitled to de novo judicial review based on the decision in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). R–P Mem. & Opp'n at 16–18; R–P Opp'n & Reply at 9–13. *Overton Park* provides that administrative agency actions generally are to be reviewed under the arbitrary and capricious standard but that de novo review of administrative actions is available under two circumstances: (1) "when the [administrative agency] action is adjudicatory in nature and the agency factfinding procedures are inadequate," and (2) "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Id.* at 413–15, 91 S.Ct. at 822–23 (citations omitted). Both parties agree that EPA's remedy selection process is adjudicatory in nature, obviating the need to discuss the second *Overton Park* exception.

■ The first *Overton Park* exception only applies to "formal adjudications"—as opposed to "informal adjudications". *See Overton Park,* 401 U.S. at 415, 91 S.Ct at 823; *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 362–3 (D.C.Cir.1981); *see also Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1157 (9th Cir.1980). Formal adjudication involves development of a record through a trial-type hearing. *Smith v. Office of Civilian Health,* 97 F.3d 950, 954 (7th Cir.1996); *see generally* Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 8.2 (3rd ed.1994). Informal adjudication, by contrast, is "a residual category including all agency actions that are not rulemaking and that need not·be conducted through 'on the record' hearings." *Izaak Walton,* 655 F.2d at 361·n. 37. EPA's remedy selection process falls into the residual category. Remedy selection does not involve rulemaking. Nor do the public hearings convened by EPA when issuing a ROD, amount to a formal adjudicatory hearing using trial-type procedures. *See* 42 U.S.C. § 9613(k)(2)(C) ("The development of an administrative record and the selection of response action· ... shall not include an adjudicatory hearing."); *see also Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823 (general public hearing is "nonadjudicative," or "quasi-legislative," in nature). Accordingly, because EPA's remedy selection falls into the residual category, Rhône–Poulenc is not entitled to de novo judicial review under the first *Overton Park* exception.

D. *Supplementation of the Administrative Record*

■ While Rhône–Poulenc is not entitled to de novo judicial review, Rhône–Poulenc still may be able to supplement the administrative record that the court will review under the arbitrary and capricious standard. Under CERCLA, judicial review generally is limited to the administrative record as it existed at the time of the agency action. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Thompson v. U.S. Department of Labor,* 885 F.2d

551, 555–56 (9th Cir.1989). Thus, as a general rule, information created or discovered after an agency has made a decision will not be considered.[14] *United States v. Amtreco, Inc.,* 806 F.Supp. 1004, 1007 (M.D.Ga.1992) (citing *Wisconsin Electric Power Co. v. Costle,* 715 F.2d 323 (7th Cir.1983)); *accord New Mexico Environmental Improvement Div. v. Thomas,* 789 F.2d 825, 835 (10th Cir.1986); *Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985); *Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C.Cir.1984). This includes documents, deposition testimony, and expert opinions generated during the course of litigation.

 Section 113(j)(1) does provide, however, that "applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court." 42 U.S.C. § 9613(j)(1). Principles of administrative law require that the administrative record be supplemented where: (1) the agency has failed to explain its actions, making judicial review of whether the agency has considered all relevant factors impossible; (2) the agency has relied on documents or materials not included in the record; (3) supplementation is necessary to explain technical terms or complex subject matter involved in the agency action; or (4) a

strong showing of agency bad faith is made.[15] *Inland Empire,* 88 F.3d at 703–4 (citing *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989, 997 (9th Cir.1993) (per curiam) and *National Audubon Soc'y v. U.S. Forest Service,* 46 F.3d 1437, 1447 n. 9 (9th Cir.1993)); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436–37 (9th Cir.1988). The party challenging the adequacy of the administrative record or the administrative process has the burden of showing that supplementation is warranted. *Princeton Gamma–Tech,* 817 F.Supp. at 493; *Amtreco,* 806 F.Supp. at 1005.

Rhône–Poulenc offers three reasons for why the administrative record must be supplemented: (1) EPA acted in bad faith in selecting remedies for the Iron Mountain Mine site; (2) EPA relied on evidence that was not in the administrative record in making its selection; and (3) the administrative record must be supplemented to explain complex and technical terms.

*1. Alleged Agency Bad Faith*

 Rhône–Poulenc's principal argument for wholesale supplementation of the administrative record is that EPA acted in bad faith in its selection of remedies in ROD 1 and ROD 2.[16] An agency acts in bad faith

---

**14.** For example, Rhône–Poulenc cites the Office of Surface mining report on plugging as a preferred means of cleaning up polluted sites, OSM Reclamation and Enforcement, 60 Fed.Reg. 68782 (Dec. 30, 1996), as evidence that EPA acted improperly when it rejected Rhône–Poulenc's plugging remedy. R–P Mem. & Opp'n at 37–38. Because that report was issued after ROD 1 and ROD 2, it cannot be considered by the court.

**15.** In *Nat'l Audubon Soc'y v. U.S. Forest Service,* 46 F.3d 1437, 1446–48 (9th Cir.1993), the court recognized two additional circumstances in which the administrative record may be supplemented. First, the administrative record may be supplemented in a case under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., where the administrative agency has "neglected to mention a serious environmental consequence" in preparing the Environmental Impact Statement. *Id.* at 1448; *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1383–86 (2nd Cir.1977). Because this case has not been brought under NEPA, the first *Nat'l Audubon* exception is inapplicable. Second, the administrative record may be supplemented to "insure there will be a full presentation of the issues" where the statutory scheme provides for

accelerated judicial review procedures. *Nat'l Audubon,* 46 F.3d at 1448 (quoting *Public Power Council v. Johnson,* 674 F.2d 791, 795 (9th Cir. 1982)). This exception is also inapplicable. The statute at issue in *Nat'l Audubon* provided that "any challenge to a timber sale must be filed in Federal District Court within fifteen days of the date of initial advertisement of the challenged timber sale." *Id.* at 1441 n. 3 (quoting § 318(g)(1) of the Northwest Timber Compromise). CERCLA, on the other hand, does not provide for accelerated judicial review procedures. *See* 42 U.S.C. §§ 9613(h), (j).

**16.** Rhône–Poulenc also argues that a showing of agency bad faith entitles it to de novo review. It relies upon *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy,* 19 F.3d 1342 (11th Cir.1994), and *United States v. Shaffer Equip. Co.,* 796 F.Supp. 938 (S.D.W.Va.1992), *aff'd in part and rev. in part,* 11 F.3d 450 (4th Cir.1993). Neither case squarely supports Rhône–Poulenc's position, which is contrary to Ninth Circuit precedent. *See e.g. Animal Defense Council v. Hodel,* 840 F.2d 1432, 1437 (9th Cir.1988). In *Latecoere,* the Eleventh Circuit found that the Navy had granted a contract to an American company over a French company based, in part, upon bias against non-American companies. 19 F.3d at

when it engages in wilful misconduct. To establish bad faith, Rhône–Poulenc must make a "strong showing." *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825; *see Sokaogon Chippewa Community v. Babbitt*, 961· F.Supp. 1276, 1280 (W.D.Wis.1997) (the party alleging agency bad faith has "a significant evidentiary burden"). Rhône–Poulenc cites numerous instances of alleged EPA misconduct, but none rises to the level of bad faith.

First, Rhône–Poulenc argues that some of EPA's decisions violate the NCP. For example, Rhône–Poulenc ·points to the $9 million EPA has spent to design the 15,000 acre-foot Spring Creek Debris Dam enlargement. R–P Mem. & Opp'n at 20–21; *see* Erickson Decl., ¶ 9. According to Rhône–Poulenc, that expenditure violates the NCP because it ·occurred before the Spring Creek Debris Dam had been formally selected in a ROD. Rhône–Poulenc also suggests that the design of the Spring Creek Debris Dam was not cost-effective, in violation of the NCP. Whether EPA's remedy decisions violate the NCP is the central issue the · court is to determine when it reviews the administrative record, using the arbitrary and capricious standard. Such allegations do not amount to bad faith.

Second, Rhône–Poulenc argues that EPA's decisionmaking framework was inadequate. According to Rhône–Poulenc, EPA took remedial actions at the Iron Mountain Mine site to protect aquatic life in the Sacramento River when there is no significant evidence that aquatic life has been injured by the acid mine drainage emanating from the Mine. R–P Mem. & Opp'n at 32–34; R–P Reply at 31. Additionally, Rhône–Poulenc contends that the State water quality standards for metals in the Sacramento River were improperly used as the cleanup criteria. Again, Rhône–

Poulenc is inviting the court to decide whether EPA's decisionmaking was arbitrary and capricious. *See e.g., In the Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 905 (5th Cir.1993) (finding that EPA had acted arbitrarily and capriciously where ·made no attempt to learn whether the proposed remedy would protect drinking water).

Third, Rhône–Poulenc recycles some of the arguments it advanced in the due process discussion above. It argues that EPA was in bad faith because its decision-making process was infected by conflicts of interest and because it failed to include notes and drafts in the administrative record. For the reasons stated above Rhône–Poulenc fails to show a potential conflict of interest by EPA. Moreover, EPA is not required to include notes and drafts in the administrative record. 40 C.F.R. § 300.810(b); *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1456 (1st Cir.1992); *Seattle Audubon*, 871 F.Supp. at 1308–09.

Finally, Rhône–Poulenc cites to the notes of Daryl Greenway of CH2M Hill from a meeting between EPA and its consultants at the San Francisco Airport on December 3, 1991. According to the notes, Andrew Lincoff stated that the EPA "should evaluate [Rhône–Poulenc's plugging] proposal, instead of working up the $ and gold-plating [it], and then throwing it out." R–P Exh. 14. According to Rhône–Poulenc, "[t]hose notes reveal that EPA, in its zeal to justify its rejection of [ Rhône–Poulenc's] plugging proposal, purposefully 'jacked up' the price of the plugging alternative...." R–P Reply at 18. The United States has countered by submitting a declaration from Lincoff who explains the "gold-plating" comment was a response to CH2M Hill's attempt to improve· upon Rhône–Poulenc's plugging proposal, which

---

1344. Because the French company had made a "strong showing of bad faith or improper behavior," in determining whether the Navy had acted arbitrarily and capriciously the Eleventh Circuit did not limit itself to reviewing the administrative record. *Id.* at 1357 (quoting *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825). However, nowhere did the court discuss de novo review. In *Shaffer Equip.*, the district court used the inherent powers of the court to dismiss EPA'S cost recovery action under CERCLA because the government attorneys failed to apprise the court and the defendants that EPA'S project manager for the allegedly polluted site had misrepresented

his academic credentials. 796 F.Supp. at 952–54. The Fourth Circuit ultimately reversed the district court, finding that dismissal of the action was too severe a sanction. 11 F.3d at 462–63. ·Without suggesting an appropriate sanction, the Fourth Circuit noted that·the district court could "deny the government the benefit of any portion of the record or the right to claim any expense, which may have been tainted by [the EPA's project manager's] misconduct" or resolve any doubt in favor of the defendant. *Id.* at 463. The Fourth Circuit did not suggest that de novo review of the entire record was the appropriate response to the misconduct.

Lincoff felt "could be mischaracterized as an attempt to 'gold-plate' Rhône–Poulenc's proposal in order to reduce its cost-effectiveness." Lincoff Decl, ¶ 8. Given that Lincoff's explanation is consistent with the notes and that Rhône–Poulenc has no evidence supporting its interpretation, the notes do not satisfy Rhône–Poulenc's burden of showing bad faith.

### 2. *Agency Reliance on Evidence Outside of the Record*

■ Rhône–Poulenc also argues that EPA relied on evidence not included in the administrative record—specifically communications from the Natural Resources Trustees, a group of state and federal government experts convened to advise EPA on natural resource issues .[17] R–P Mem. & Opp'n at 30–32; R–P Reply at 29–31. Where the agency is engaged in informal adjudication, as opposed to formal adjudication or rulemaking, there is no per se prohibition on ex parte contacts. *See Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1540 (9th Cir.1993) (finding that the ex parte communications prohibition applies when there is an adjudication "on the record"); *see generally Administrative Law Treatise* § 8.4 ("The APA prohibition on ex parte communications does not apply . . . to informal adjudications. . . ."); *but see Environmental Defense Fund v. Blum*, 458 F.Supp. 650, 660 (D.D.C.1978) (finding that ex parte communications were improper in informal adjudication). Thus, to justify supplementation of the record, Rhône–Poulenc must show not only that EPA communicated with the Natural Resources Trustees, but also that EPA relied upon those communications in selecting the remedies in RODs 1 and 2. *See Blum*, 458 F.Supp. at 660–61. Rhône–Poulenc has

not done this. Rhône–Poulenc cites to the deposition testimony of Richard Sugarek and Jeffery Zelikson, but both only discuss input from the Natural Resources Trustees in general terms.[18] R–P Exhs. B, E (Sugarek Dep. 294:11–25, 599:3–16; Zelikson Dep. at 105:16–106:17).

### 3. *Technical Questions*

■ Finally, Rhône–Poulenc argues that complex and technical issues "abound" in this case and that the administrative record must be supplemented to help explain those issues. R–P Mem. & Opp'n at 36–37. But Rhône–Poulenc fails in this motion to identify a single complex or technical issue that only can be explained by supplemental evidence. Perhaps some supplementation on this ground may prove necessary, but such supplementation should be limited and precise.

### E. *The Problem of Remedy Implementation*

To the extent that Rhône–Poulenc plans to challenge the reasonableness of the cost of implementing the remedies EPA selected, the United States also seeks to limit judicial review of remedy implementation decisions to the administrative record, applying the arbitrary and capricious standard. Rhône–Poulenc requests de novo judicial review of remedy implementation by the EPA. This issue was not well briefed. In particular, Rhône–Poulenc fails to focus on any particular remedy implementation decision that it challenged. The court declines to resolve the issue as a hypothetical question.

■ EPA remedy implementation decisions generally are treated as a subset of remedy selection decisions, suggesting that review should be based on the administrative record.[19] *See United States v. Hardage*, 982

---

**17.** Rhône–Poulenc also makes the converse argument—that high-level EPA officials, who were the decisionmakers with regard to the Iron Mountain Mine site, did not review the evidence contained in the administrative record. R–P Mem. & Opp'n at 34. There is no requirement that high-level agency officials sift through the documents that make up the administrative record, so long as the agency, as an institution, has reviewed them. *See Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938).

**18.** Moreover, the only "communications" Rhône–Poulenc identifies, with any specificity, are the meetings between EPA and the Natural Resources Trustees. R–P Exh. 30 (Summary of Documented Meetings Between EPA and Natural Resources Trustee Agencies). To the extent Rhône–Poulenc is arguing that the participants' notes from those meetings should be included in the administrative record, the NCP is clear that notes from meetings need not be included in the administrative record. 40 C.F.R. § 300.810(b).

**19.** One of the factors EPA must consider in choosing a remedy is its cost-effectiveness in

F.2d 1436, 1443 (10th Cir.1992). But it is possible that the agency could select a remedy at such an abstract and general level·that the costs of the remedy would only become known upon implementation and the decisions made in the course of implementation. Remedy selection at this level of generality could be arbitrary and capricious if the possible costs of implementation were not factored into the selection process. Further, if Rhône–Poulenc can later show that EPA's remedy selection process did not give Rhône–Poulenc a fair opportunity to comment upon the costs of remedy implementation decisions it may be entitled to supplement the record or to de novo review.[20]

### III.

The United States' motion is GRANTED to the extent stated in this opinion.

IT IS SO ORDERED.

implementation. *See* 40 C.F.R. § 300.430(e)(9)(iii); *Hardage,* 982 F.2d at 1443.

**20.** At oral argument, counsel for the United States argued that, if the NCP was silent as to a

particular component of the implementation of a remedy, there could be no judicial review of EPA's decision regarding that component. This assertion may raise constitutional questions.